UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CAROL BRINKER, et al.,

        Plaintiffs,

v.                                    Case No. 8:10-CV-1199-T-27AEP

CHICAGO TITLE INSURANCE CO.,
et al.,

        Defendants.

_____/

## REPORT AND RECOMMENDATION

THIS MATTER comes before the Court on Defendants Commonwealth Land Title Insurance Company and Chicago Title Insurance Company's (collectively, "Defendants") **Amended Motion to Dismiss** (the "Motion") (Dkt. No. 25). Plaintiffs filed a Memorandum of Law in Opposition to the Amended Motion to Dismiss (the "Opposition") (Dkt. No. 27). At Plaintiffs' request (Dkt. No. 28), the Court held a hearing on Defendants' Motion on October 29, 2010. The Court has carefully reviewed and considered the Motion, the Opposition, and the parties' arguments made at the October 29, 2010 hearing, and is otherwise fully advised in the premises. For the reasons that follow, this Court recommends that the Motion be denied.[1]

---

    [1] Defendants' Amended Motion to Dismiss (Dkt. No.25) was referred to the undersigned by the Honorable James D. Whittemore for a Report and Recommendation. (Dkt. No. 29.)

**Background**

On May 25, 2010, Plaintiffs filed a breach of contract Class Action Complaint (Dkt. No. 1), alleging that Defendants breached the closing protection letters they issued when they failed to indemnify Plaintiffs for losses resulting from the closing agent's fraudulent and/or dishonest conduct in connection with real estate closings. The facts, as alleged in the Complaint and which must be accepted as true, are set forth below:

Plaintiffs are purchasers of condominium hotel units in "Cay Clubs" properties, including Clearwater and Sarasota. (Dkt. No. 1 ¶¶ 5-9, 15.) In connection with these purchases, Plaintiffs allege that Defendants issued closing protection letters in favor of Plaintiffs. (*Id*. ¶ 13.) These letters provided that Defendants would reimburse lenders and purchasers for losses incurred by them in connection with closings, when the loss arises out of the fraud and/or dishonesty of the issuing agent or approved attorney in handling funds or documents in connection with the closings. (*Id*. ¶ 111.) Plaintiffs allege that Defendants' issuing agent and approved attorney, W. Scott Callahan, Esq. ("Callahan") acted as the closing agent and attorney in connection with these transactions. (*Id*. ¶ 14.)

According to Plaintiffs, Callahan had ties to the two principals of "Cay Clubs" and had previously performed legal services for them, including forming the various limited liability companies that comprise Cay Clubs. (*See id*. ¶¶ 16-25.) Plaintiffs claim that the two principals did not have the capital to acquire the units that ultimately became Clearwater Cay Club and therefore, "through an entity they formed with Callahan's assistance, DC703, LLC, entered into a takedown agreement with an affiliate of an entity known as 'Sunvest' and controlled by Harvey

2

Birdman." (*Id*. ¶¶ 28, 30.)  In or about September of 2004, the Sunvest entities allegedly acquired

what would later become Clearwater Cay Club[2] and pursuant to the takedown agreement, DC703

agreed to acquire from Sunvest all of the units at agreed prices over time.  (*Id*. ¶¶ 31-32.)  Around

the same time, Cay Clubs allegedly began marketing units in the complex and began securing

membership deposits from prospective buyers.  (*Id*. ¶ 34.)  However, Plaintiffs allege that at that

time, DC703 did not own any units in what would become the Clearwater Cay Club.  (*Id*. ¶ 38.)

Plaintiffs assert that Callahan was involved in preparing all the pertinent condominium

documents, the form purchase agreement, membership documents, and related legal documents

for Clearwater Cay Club. (*Id*. ¶ 40.)  According to Plaintiffs, in late November or early December

of 2004, Cay Clubs began disseminating to prospective purchasers the standard purchase

agreement prepared by Callahan as well as other pertinent condominium related documents,

which "did not put the prospective purchasers on notice that Cay Clubs (DC703) did not own the

units it was attempting to sell."  (*Id*. ¶¶ 41-42.)

Plaintiffs allege that "[a]s counsel for Cay Clubs, Callahan knew that Cay Clubs did not

own the vast majority of the units it was marketing to victim purchasers.  Rather, the units were

allegedly "owned by whatever Sunvest entity had been formed for the purpose of purchasing the

complex that would later become a Cay Clubs property."  (*Id*. ¶ 57.)  According to Plaintiffs,

"with Callahan's full knowledge, Cay Clubs entered into hundreds of contracts with purchaser

---

[2]  According to Plaintiffs, the Sunvest entities acquired a 336 unit apartment complex
known as The Grand Venezia at Baywatch, which was later converted into a condominium
complex, and a minority of the units in the adjoining The Grand Bellagio at Baywatch
complex that had previously been converted into condominium units.  All these units later
formed Cay Clubs.  (Dkt. No. 1 ¶ 29.)

victims to sell units Cay Clubs did not even own." (*Id.* ¶ 58.) Plaintiffs claim that "[i]n a typical transaction, Cay Clubs would secure a deed for a unit from the Sunvest entity that owned the unit (which deed was prepared by Callahan) and then contemporaneously flipped the unit to a Cay Clubs' victim via a deed also prepared by Callahan." (*Id.* ¶ 63.)

Plaintiffs further allege that the units were flipped "at artificially inflated, outrageous prices" based on "grossly fraudulent appraisals which would support the outrageous purchase prices." (*Id.* ¶¶ 64-65.) To "mislead the victims," Callahan allegedly identified on the settlement statement the price that Cay Clubs paid for a particular unit as the "Birdman Release Price." (*Id.* ¶¶ 83-84.) Thus, according to Plaintiffs, "[b]y using language on the settlement statements such as the 'Birdman Release Price,' the purchasers were not informed that what was actually transpiring was a contemporaneous flip" and they were purchasing units "which were being contemporaneously flipped to them at prices some two to four times what they Cay Clubs entities were paying for them." (*Id.* ¶¶ 85-87.) Thus, Plaintiffs accuse Callahan of participating in the fraudulent flipping scheme, including handling both sides of the contemporaneous transactions between Sunvest and Cay Clubs on one hand, and Cay Clubs and Plaintiffs, on the other hand, with knowledge of the fraudulent appraisals.

Additionally, Plaintiffs state that Callahan was involved in another fraudulent scheme designed to induce Plaintiffs into purchasing the units. According to Plaintiffs, they were informed that they would receive a lump sum leaseback payment equal to 15% of the purchase price after the closing, "as a major inducement to victimize purchasers." (*Id.* ¶¶ 53-55.) Plaintiffs allege that "Callahan knew that it was the practice of Cay Clubs to enter into oral leaseback

4

agreements with prospective purchasers prior to the closings, with the routine being that the actual leaseback agreements would be forwarded to the purchasers a few days after the closing." (*Id*. ¶ 78.) This was allegedly done to avoid a "paper trail" regarding the leaseback arrangements prior to the closings and circumvent applicable federal and state securities laws. (*Id*. ¶¶ 79-80.) In this manner, Plaintiffs allege that Callahan concealed the 15% lump sum leaseback from legitimate lenders and any purchasers of the loans, who, had they been aware, "either never would have made the loans at all or would not have made the loans on the terms they did." (*Id*. ¶¶ 81-82.)

Thus, Plaintiffs allege that Callahan engaged in fraud or dishonesty by failing to reflect the lump sum leaseback payment on the settlement statements, failing to disclose the contemporaneous flips, and mishandling Plaintiffs' funds by diverting them to Cay Clubs "with full knowledge that Cay Clubs was engaged in a fraudulent flipping scheme." (*Id*. ¶¶ 88-89.) Plaintiffs allege that these fraudulent and/or dishonest acts entitle them to indemnification under the closing protection letters. (*Id*. ¶¶ 156-68.) Specifically, Plaintiffs assert that "[p]ursuant to the closing protection letters, Defendants agreed to reimburse [Plaintiffs] . . . for actual losses incurred by them in connection with their closing whenever there was 'fraud or dishonesty' on the part of their issuing agent or approved attorney." (*Id*. ¶ 157.) Plaintiffs claim that Defendants have breached the closing protection letters by failing and/or refusing to reimburse Plaintiffs for the losses suffered as a result of Callahan's fraud or dishonesty. (*Id*. ¶¶ 166-67.) Thus, Plaintiffs have sued Defendants for breach of contract to recover losses "in various forms such as down payments (for those who made down payments), closings costs, 'developer's fees,' carrying costs on their units such as mortgage payments, taxes, insurance and condominium association fees,

and other miscellaneous expenses associated with the acquisition and ownership of the units." (*Id.* ¶ 168.)

Defendants seek dismissal of Plaintiffs' Complaint on the basis that Callahan's duty to perform closing services did not encompass his allegedly fraudulent acts.  Specifically, Defendants assert that: (1) the leaseback payments were not required to be listed on the HUD-1, (2) the flipping scheme was not fraudulent and Callahan did not have a duty to ensure that Plaintiffs understood the phrase "Birdman Release Price" and the mechanics of Cay Clubs' contract with Sunvest, and (3) Callahan did not owe the borrowers any duties with respect to the appraisals.  (*See* Dkt. No. 25.)

**Standard of Review**

Rule 8 of the Federal Rules of Civil Procedure specifies that a complaint must contain "a short and plain statement of the claim showing the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  If the complaint fails to state a claim upon which relief may be granted, a motion to dismiss may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).  In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all factual allegations in a complaint as true and take them in the light most favorable to the plaintiff.  *See Erickson v. Pardus*, 551 U.S. 89, 127 S. Ct. 2197, 2200, 167 L.E.2d 1081 (2007).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964-65, 167

6

L.Ed.2d 929 (2007) (internal citations omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true." *Id.*  Plaintiff must plead enough facts to state a plausible basis for the claim. *Id.*; *see also James River Ins. Co. v. Ground Down Eng'g, Inc.*, 540 F.3d 1270, 1274 (11th Cir. 2008) ("To survive dismissal, 'the complaint's allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level; if they do not, the plaintiff's complaint should be dismissed.'") (*citing Bell. Atl.*, 127 S. Ct. at 1965).

Moreover, when deciding a motion to dismiss, a court's review "is limited to those facts contained in the pleadings and attached exhibits."  *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199 (11th Cir. 2007); *see also Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (noting that a court "may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed").  Thus, the Court will consider only the contents of the operative Complaint and the undisputed central documents.

**Discussion**

Defendants seek dismissal of Plaintiffs' Complaint on the basis that it fails to plausibly allege a claim for breach of contract under the closing protection letters.  The elements of an action for breach of contract are: (1) the existence of a contract, (2) a breach of the contract, and (3) damages resulting from the breach.  *Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. Dist. Ct. App. 2006) (*citing Knowles v. C.I.T. Corp.*, 346 So. 2d 1042, 1043 (Fla. Dist. Ct. App. 1977)).  Where a contract is reasonably susceptible to two different interpretations, it is

ambiguous. *Commercial Capital Res., LLC v. Giovannetti*, 955 So. 2d 1151, 1153 (Fla. Dist. Ct. App. 2007); *Okeelanta Corp. v. Bygrave*, 660 So. 2d 743, 747-48 (Fla. Dist. Ct. App. 1995). Because interpretation of ambiguous contracts potentially involves questions of fact, dismissal under Rule 12(b)(6) is inappropriate. *See Harman v. Adjoined Consulting, LLC.*, No. 06-22781-CIV, 2007 WL 2377058, at *6 (S. D. Fla. Aug. 16, 2007).

In this instance, the parties do not dispute the existence of a valid contract, namely the closing protection letters. Rather, the parties dispute whether Defendants breached the closing protection letters by failing to indemnify Plaintiffs for losses incurred in the purchase of the Cay Clubs condominium units. The closing protection letters provide, in pertinent part:

> When title insurance of CHICAGO TITLE INSURANCE COMPANY (hereinafter called "the Company") is specified for your protection in connection with closings of real estate transactions in which you are to be the lessee or purchaser of an interest in land or a lender secured by a mortgage (including any other security instrument) of an interest in land, the Company, subject to the Conditions and Exclusions set forth below, hereby agrees to reimburse you for actual loss incurred by you *in connection with such closing* when conducted by said Issuing Agent or Approved Attorney *when such loss arises out of*:
> . . .
> 2. *Fraud or dishonesty* of said Issuing Agent or Approved Attorney *in handling your funds or documents in connection with such closing.*
> If you are a lender protected under the foregoing paragraph, your borrower in connection with a loan secured by a mortgage on a one-to-four family dwelling shall be protected as if this letter were addressed to your borrower.

(Dkt. No. 1, Ex. C) (emphasis added). In essence, Defendants make four arguments in support of the dismissal of the breach of contract claim. First, Defendants argue that Callahan did not act fraudulently or dishonestly by not listing the potential leaseback payments on the HUD-1 because

8

the leaseback payments "simply were not required to be listed on the HUD-1." (Dkt. No. 25 at 5.) Defendants contend that the HUD-1 must reflect only those charges and adjustments made in connection with the settlement, i.e., the execution of the lien documents, and since the leaseback documents were not executed and the payments not made in connection with the settlement, they were not required to be shown on the HUD-1. (*Id*.) And, to the extent Plaintiffs argue that Callahan was required to inform the lenders about the leaseback program, Defendants contend that Plaintiffs have no claim against Callahan for inaccuracies in the HUD-1 because they were aware of the inaccuracy. (*Id*. at 6.) Additionally, Defendants state that Plaintiffs, as participants in the alleged fraud, cannot sue under the closing protection letters. (*Id*.)

Second, Defendants argue that Callahan's participation in the flipping scheme was not fraudulent and/or dishonest. (*Id*. at 7.) Defendants state that Plaintiffs have no claim for being deceived about payments actually shown on a HUD-1, such as the "Birdman Release Price" "merely because [Plaintiffs] did not fully understand the charges or the abbreviations used on the HUD-1." (*Id*.)

Third, Defendants assert that Callahan did not act fraudulently or dishonestly in connection with the allegedly inflated appraisals. (*Id*. at 8.) Defendants argue that Callahan owed no duty to Plaintiffs with respect to the appraisals and that claims based on fraudulent appraisals are limited to actions between the appraiser and the party for whom the appraisal was prepared (*Id*.) Additionally, Defendants argue that Florida law prohibits title agents to value real property or guaranty the accuracy of an appraisal and thus, the closing protection letters will not protect Plaintiffs for such activities specifically prohibited.

9

Fourth and lastly, Defendants contend that the losses alleged, namely down payments, closing costs, developer's fees, carrying costs, mortgage payments, taxes, insurance, condominium association fees, and expenses associated with acquisition and ownership of the units, are not losses "incurred in connection with the closing" or arising out of Callahan's alleged fraud or dishonesty in handling Plaintiffs' funds or documents.  (*Id*. at 9.)   According to Defendants, Plaintiffs did not allege that the absence of the leaseback payment on the HUD-1, the phrase "Birdman Release Price," and the inflated appraisals prevented them from receiving the condominium units for which they undertook these expenses.  (*Id*.)   Additionally, Callahan's alleged fraud or dishonesty did not cause the project to fail or Plaintiffs to default on their mortgage payments.  (*Id*.)   Thus, Defendants argue that Plaintiffs' losses are not recoverable.

The central dispute between the parties is whether Callahan's conduct in the closings was fraudulent and/or dishonest to entitle Plaintiffs to indemnification under the closing protection letters.  And Defendants' arguments focus on whether Callahan's conduct constituted fraud and/or dishonesty.  Defendants' challenges, however, are inappropriate in the context of a motion to dismiss where all well-pled allegations are treated as true.  The closing protection letters broadly state that Defendants will reimburse the lender and Plaintiffs, as the borrowers, for actual losses incurred in connection with closings when the losses arise out of the *fraud or dishonesty* of the issuing agent in handling Plaintiffs' funds or documents in connection with the closings.  The letters themselves do not define the terms "fraud or dishonesty" as used in the closing protection letters.  And Plaintiffs have alleged that Callahan committed fraud and/or dishonesty in handling documents, specifically the HUD-1, in connection with the closings by 1) failing to reflect the

10

lump sum leaseback payment on the HUD-1 (Dkt. No. 1 ¶¶ 77-82); 2) purposely using "vague language" such as the "Birdman Release Price" on the HUD-1 to mislead victims (*id*. ¶¶ 84-85); and 3) failing to reflect on the HUD-1 that Cay Clubs did not own the units, such that "the purchaser victims were unaware that they were purchasing units which were being contemporaneously flipped to them at prices some two to four times what the Cay Clubs entities were paying for them" (*id*. ¶¶ 86-87). Additionally, Plaintiffs have alleged that Callahan engaged in fraud and/or dishonesty in handling Plaintiffs' funds by 1) diverting Plaintiffs' funds to Cay Clubs "with full knowledge that Cay Clubs was engaged in a fraudulent flipping scheme" (*id*. ¶¶ 89-92); and 2) diverting Plaintiffs' funds to Cay Clubs and to the Birdman entities, knowing "that there were various bogus costs and charges . . . being passed on to purchasers," such as the allegedly fraudulent appraisal costs (*id*. ¶¶ 93-94). Construing the facts alleged in light most favorable to Plaintiffs, the Court concludes that these allegations of fraud and/or dishonesty are sufficient to allow Plaintiffs' breach of contract action to proceed.[3]

Defendants in effect are asking this Court to construe the meaning of "fraud" and/or "dishonesty" under the contract and interpret these terms in a manner as to exclude Callahan's conduct. However, Plaintiffs' allegations plausibly establish that Callahan may have engaged in

---

[3] At the October 29, 2010 hearing, Plaintiffs argued that Callahan's knowledge of the fraudulent activities "alone would trigger coverage." (*See* Dkt. No. 36, Hr'g Tr. 22:19-20, Oct. 29, 2010). Nonetheless, Plaintiffs maintained that Callahan in fact "played an active role" in the fraud. (*Id*. 22:25.) Thus, Plaintiffs argued that Callahan engaged in fraud and/or dishonesty first by not disclosing the fraudulent transaction and second, by actively participating in the fraudulent transaction. The Court need not address the issue of whether Callahan's passive participation constitutes fraud and/or dishonesty as the Court concludes that Plaintiffs have sufficiently alleged fraud and/or dishonesty on Callahan's part entitling Plaintiffs to coverage under the closing protection letters.

fraudulent and/or dishonest conduct.  At this stage of the proceedings, the Court declines to decide the factual inquiry of whether or not Callahan's actions were indeed fraudulent and/or dishonest.  Rather, such analysis is more appropriate in the context of a motion for summary judgment.  *See John M. Floyd & Associates, Inc. v. First Fla. Credit Union*, 2010 WL 1793901 at *4 (M.D. Fla. May 5, 2010) (citations and quotations omitted) ("to determine whether there was a breach of the Agreement, the Court will need to interpret the Confidentiality provision of the Agreement.  The proper interpretation of this provision is not a matter that can be resolved on a motion to dismiss for failure to state a claim.  Instead, this sort of interpretation is better suited to a motion for summary judgment.  A motion to dismiss simply tests the sufficiency of the complaint and does not decide the merits of the case.").

Accordingly, at this juncture in the case, the Court concludes that Plaintiffs have sufficiently alleged that Callahan's conduct was fraudulent and/or dishonest, entitling Plaintiffs to indemnification under the closing protection letters.  Thus, accepting all factual allegations in Plaintiffs' Complaint (Dkt. No. 1) as true and taking them in the light most favorable to Plaintiffs, the Court finds that Plaintiffs' allegations sufficiently raise a right to relief against Defendants based on breach of contract under the closing protection letters.

## Conclusion

For the reasons stated herein,  this Court respectfully **RECOMMENDS** that Defendants' Amended Motion to Dismiss (Dkt. No. 25) be **DENIED**.

12

**IT IS SO REPORTED** at Tampa, Florida on this 30th day of November, 2010.

_____
ANTHONY E. PORCELLI
United States Magistrate Judge

### NOTICE TO PARTIES

Failure to file and serve written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date it is served on the parties shall bar an aggrieved party from a de novo determination by the District Court of issues covered in the report, and shall bar the party from attacking on appeal factual findings in the report accepted or adopted on appeal by the District Court except upon grounds of plain error or manifest injustice. 28 U.S.C. § 636(b)(1)(C); Local Rule 6.02; *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc).

Copies furnished to:
Hon. James D. Whittemore
Counsel of Record

13