**CAROL BRINKER, JOE BRINKER,
KIMBALL PUGMIRE, LAURIE McNULTY,
SHELDON SHORE, CANDY WARNER,
and KERRY WARNER, JR.,**

   **Plaintiffs,**

**vs.**           **Case No. 8:10-cv-1199-T-27AEP**

**CHICAGO TITLE INSURANCE COMPANY
and COMMONWEALTH LAND TITLE
INSURANCE COMPANY,**

   **Defendants.**

_____/

## REPORT AND RECOMMENDATION

THIS MATTER comes before the Court on **Plaintiffs' Motion for Class Certification** (Dkt. No. 53), **Defendants' Opposition to Class Certification** (Dkt. No. 74), and **Plaintiffs' Reply to Opposition to Class Certification** (Dkt. No. 80).[1] Pursuant to Rule 23 of the Federal Rules of Civil Procedure and Local Rule 4.04 of the Middle District of Florida, Plaintiffs request that the Court certify this case as a class action. Defendants argue, among other things, that Plaintiffs' claims "require individualized proof to establish the terms of their contracts, breach, loss causation, and damages" and therefore oppose class certification. (Dkt. No. 74 at 1.) The Court held a hearing on December 13, 2011 to address

---

[1]Additionally, as allowed by the Court, the parties filed supplemental memoranda (Dkt. No.'s 107 & 108), which addressed the specific issue as to whether the Court should consider the impact of one of Defendants' alleged affirmative defenses upon class certification.

these issues.  After due consideration, the Court finds that although Plaintiffs can satisfy the prerequisites delineated in Rule 23(a), Plaintiffs' request to certify the proposed class should fail because, under Rule 23(b)(3), individualized issues in the case predominate over any common issues of fact or law.  As such, the Court recommends that Plaintiffs' Motion for Class Certification (Dkt. No. 53) be denied.

## I. <u>Background</u>

On May 25, 2010, Plaintiffs filed a Class Action Complaint (Dkt. No. 1) alleging that Defendants breached the closing protection letters they issued when they failed to indemnify Plaintiffs for losses that arose out of the closing agent's fraudulent and/or dishonest conduct in handling the funds and/or documents in connection with real estate closings.

Plaintiffs are purchasers of condominium hotel units in "Cay Clubs" properties in Clearwater and Sarasota.  (Dkt. No. 1 ¶¶ 5-9, 15.)  In connection with these purchases, Plaintiffs allege that Defendants issued closing protection letters in favor of Plaintiffs.  (*Id*. ¶ 13.) These letters provided that Defendants would reimburse lenders and purchasers for losses incurred by them in connection with closings, when the loss arises out of the fraud and/or dishonesty of the issuing agent or approved attorney in handling funds or documents in connection with the closings.  (*Id*. ¶ 111.)  Plaintiffs allege that Defendants' issuing agent and approved attorney, W. Scott Callahan, Esq. ("Callahan"), acted as the closing agent and attorney in connection with these transactions.  (*Id*. ¶ 14.)

Plaintiffs contend that, with Callahan's active participation, Cay Clubs was involved in a pernicious scheme whereby Plaintiffs and hundreds of other victims purchased units that

Cay Clubs contemporaneously flipped to them at artificially inflated prices. (Dkt. No. 53 at 1.)

Plaintiffs argue that Callahan and the law firms he worked for failed to disclose to the

purchasers material facts relating to the transactions, such as Callahan's ownership interest in

Cay Clubs. (*Id.* at 1-2.)  Again, Plaintiffs assert that, at all material times, Callahan acted as

the issuing agent and approved attorney for both Defendants. (Dkt. No. 1 ¶ 106.)  The

substantive language of the closing protection letters issued by each Defendant is identical.[2]

(*Id.* ¶ 108.)  The closing protection letters provide that Defendants agreed, *inter alia*, to

reimburse lenders and purchasers for losses incurred by them:

> in connection with such closings when conducted by said
> Issuing Agent or Approved Attorney when such loss arises out
> of:
>
> . . .
>
> 2. Fraud or dishonesty of said Issuing Agent or Approved
> Attorney in handling your funds or documents in connection
> with such closings.

(*Id.*, Ex. D at 1.)

As Plaintiffs assert, there has been a slight modification to Plaintiffs' initial

definition of the class set forth in the Complaint.  In their Motion for Class Certification (Dkt.

No. 53), Plaintiffs define the proposed class as follows:

> The class is defined as all purchasers/borrowers in whose favor
> closing protection letters were issued by Chicago Title and/or
> Commonwealth in connection with closings on Cay Clubs'
> condominium units in the State of Florida where W. Scott
> Callahan, Esq., through the law firms with which he was

---

[2]The form and content of the closing protection letter is mandated by Florida
regulations.  *See* 69 FL ADC 69O-186.010.

previously affiliated (Stump, Storey, Callahan, Dietrich & Spears, P.A., and Ruden McCloskey, P.A.), acted as the issuing agent and approved attorney for the Title Companies. Excluded from the class are all Cay Clubs' insiders, including Cay Clubs' principals, employees and agents. As set forth more fully below, it is estimated that there are in excess of 300 individuals who qualify as members of the requested class. The period in which the purchases occurred was 2005 through 2008.

(Dkt. No. 53 at 3.) At the hearing held on December 13, 2011, Plaintiffs stipulated that the class should only be composed of those who received a closing protection letter or whose lender had instructions requiring the issuance of a closing protection letter. Plaintiffs also stipulated that the buyers whose lenders waived the closing protection letter requirement should not be included in the class. However, Plaintiffs argue that only those with proof of a valid waiver in their "file" should be excluded. Finally, Plaintiffs stated at the hearing that only those who suffered out-of-pocket losses as a result of the closings, and therefore have a valid contract claim, should be included in the class.

## II. <u>Legal Standards</u>

A district court has broad discretion in determining whether to certify a class. *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1569 (11th Cir. 1992). "[A]ny analysis of class certification must begin with the issue of standing." *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987). It is well-settled that, prior to the certification of the class and before undertaking any formal typicality or commonality review, "the district court must determine that at least one named class representative has Article III standing to raise each class subclaim." *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000).

4

Certification of class actions is authorized and governed by Federal Rule of Civil

Procedure 23. *Bacon v. Stiefel Laboratories, Inc.*, 275 F.R.D. 681, 689 (S.D. Fla. 2011).

Rule 23(a) provides the prerequisites for certification of a class action:

> (1)  the class is so numerous that joinder is impracticable;
> (2)  there are questions of law or fact common to the class;
> (3)  the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4)  the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). If the Court determines that the requirements of Rule 23(a) have been

met by the moving party, the Court then proceeds to determine if the requirements of Rule

23(b) have been meet. *Hudson v. Delta Air Lines, Inc.*, 90 F.3d 451, 456, n.8 (11th Cir.

1996). The party seeking class certification must show that its action falls into one of three

possible categories under Rule 23(b). *Gibbs Properties Corporation v. CIGNA Corporation*,

196 F.R.D. 430, 434 (M.D. Fla. 2000). In the present case, Plaintiffs assert their claims under

Rule 23(b)(3), which provides that a class action may be maintained if Rule 23(a) is satisfied

and if:

> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> > (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> >
> > (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

        (C) the desirability or undesirability of concentrating
the litigation of the claims in the particular forum; and

        (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

When determining whether the requirements of Rule 23 are satisfied, the Court cannot consider the merits of the plaintiffs' claims. *Gibbs*, 196 F.R.D. at 434 (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 175-76 (1974)). "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen*, 417 U.S. at 178. This is otherwise known as the *Eisen* principle. With the *Eisen* principle in mind, in deciding a motion for class certification, the court is generally bound to take the substantive allegations of the complaint as true. *Drayton v. Western Auto Supply Co.*, No. 01-10415, 2002 WL 32508918, at *6 (11th Cir. March 11, 2002); *Neumont v. Monroe County, Fla.*, 198 F.R.D. 554, 557 (S.D. Fla. 2000). However, the court may also look beyond the pleadings to determine whether a motion for class certification should be granted. *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 722-23 (11th Cir. 1987). Evidence relevant to the certification question is often intertwined with the merits. *Nelson v. United States Steel Corp.*, 709 F.2d 675, 679 (11th Cir. 1983). For this reason, the *Eisen* principle "should not be talismanically invoked to artificially limit a trial court's examination of the factors necessary to a reasoned determination of whether a plaintiff has met her burden of establishing each of the Rule 23 class action requirements." *Gibbs*, 196 F.R.D. at 434 (*quoting Love v. Turlington*, 733 F.2d 1562, 1564 (11th Cir. 1984)).

## III. **Analysis**

### A. Standing

As stated previously, the analysis of class certification must begin with the issue of standing. *Griffin*, 823 F.2d at 1482. "[I]t is not enough that a named plaintiff can establish a case or controversy between himself and the defendant by virtue of having standing as to just one of many claims he wishes to assert." *Id.* at 1483. "Rather, each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to the claim." *Id.*

Plaintiffs assert that all of the named Plaintiffs purchased Cay Clubs units where Callahan, through the law firms with which he was previously affiliated, acted as the closing attorney and issuing agent for Defendants and that closing protection letters were issued in favor of the named representatives. Specifically, they contend that:

> Carol and Joe Brinker, Kimball Pugmire, Laurie McNulty and Sheldon Shore all purchased units in Clearwater Cay Club. Candy Warner and Kerry Warner purchased a unit in Sarasota Cay Club, and Kerry Warner also purchased a unit in Orlando Academy Cay Club. All transactions were handled by Callahan. Plaintiffs further noted in their Declarations being filed in support of this Motion that they suffered monetary damages as a result of their respective transactions. Accordingly, Plaintiffs have standing to pursue the contractual claim against the Title Companies on behalf of themselves and on behalf of similarly situated victims.

(Dkt. No. 53 at 6.)

Although they do not touch specifically on the issue of standing, Defendants generally assert that Plaintiffs' claims require individualized proof and therefore oppose class certification. Further, Defendants state that not every transaction included a closing protection

letter; notably, they contend that "[a]mong the Plaintiffs themselves, only five out of nine transactions actually included a CPL." (Dkt. No. 74 at 17.) However, the Court finds that Plaintiffs have sufficiently alleged that at least one of the named representatives suffered the injury that gives rise to the class action claim. As such, the Court finds that Plaintiffs have standing to serve as named representatives for the proposed class. *See Griffin*, 823 F.2d at 1483 (finding that at least one named plaintiff must have suffered the injury that gives rise to the claim).

### B. Rule 23(a)

#### I) Numerosity

In order to satisfy the numerosity requirement, the prospective class must be so numerous that joinder of the members is impractical. Fed. R. Civ. P. 23(a)(1). However, "impractical does not mean impossible." *Hively v. Northlake Foods, Inc.*, 191 F.R.D. 661, 666 (M.D. Fla. 2000) (citation and internal quotations omitted). To satisfy numerosity, plaintiffs must proffer some evidence of the number of members in the purported class or at least a reasonable estimate of that number. *Leszczynski v. Allianz Ins.*, 176 F.R.D. 659, 669 (S.D. Fla. 1997). "[W]hile there is no fixed numerosity rule, generally less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors." *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986) (citation and internal quotations omitted).

Here, Plaintiffs and Defendants have reached the following stipulation:

> In excess of **300 individuals** purchased units in Cay Clubs'
> projects in the State of Florida, in transactions in which law
> firms associated with W. Scott Callahan, Esq., conducted the
> closings and issued the Title Companies' title insurance policies

> and closing protection letters. This stipulation is for class certification purposes only, and the Title Companies have not yet determined whether closing protection letters were actually issued in all of the Cay Clubs' transactions. The Title Companies reserve their right to defend any individual claim on the basis that there was no closing protection letter issued in connection with the transaction.

(Dkt. No. 53 at 6) (emphasis added). Thus, the Court finds that the proposed class meets the numerosity requirement of Rule 23(a)(1).

### ii) Commonality

A class may be certified only if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Nevertheless, all of the questions of law or fact raised by the case need not be common to all of the plaintiffs. *Walco Investments, Inc. v. Thenen*, 168 F.R.D. 315, 325 (S.D. Fla. 1996). However, "a class action must involve issues that are susceptible to class-wide proof." *Cooper v. S. Co.*, 390 F.3d 695, 713 (11th Cir. 2004). Of particular importance in this case, many courts have held that "where a common scheme of deceptive conduct is alleged, common questions of law and/or fact will exist." *Walco*, 168 F.R.D. at 325; *see Bacon*, 275 F.R.D. at 691; *see Gibbs Properties*, 196 F.R.D. at 435. Further, the Court is mindful that "[t]he threshold for commonality is not high . . . [and f]actual differences between class members do not necessarily preclude a finding of commonality." *Andrews v. CSX Transporation, Inc.*, No. 3:06-cv-704-J-32HTS, 2009 WL 22324, at *5 (M.D. Fla. Jan. 2, 2009) (*quoting Leszcynski*, 176 F.R.D. at 671).

Here, Plaintiffs assert that, although their claim against Defendants is founded in contract, "the underlying conduct giving rise to the contractual claim relates to the 'fraud or dishonesty' on the part of Callahan and the law firms with which he was affiliated." (Dkt. No.

53 at 8.)  The alleged facts surrounding this fraud or dishonesty are fully outlined in the

Complaint.  Among other things, Plaintiffs allege that the Cay Clubs units were flipped "at

artificially inflated, outrageous prices" based on "grossly fraudulent appraisals which would

support the outrageous purchase prices."  (Dkt. No. 1 ¶¶ 64-65.)  To "mislead the victims,"

Callahan allegedly identified on the settlement statement the price that Cay Clubs paid for a

particular unit as the "Birdman Release Price."  (*Id*. ¶¶ 83-84.)  Thus, according to Plaintiffs,

"[b]y using language on the settlement statements such as the 'Birdman Release Price,' the

purchasers were not informed that what was actually transpiring was a contemporaneous flip"

and they were purchasing units "which were being contemporaneously flipped to them at

prices some two to four times what the Cay Clubs entities were paying for them."  (*Id*. ¶¶ 85-

87.)  Thus, Plaintiffs accuse Callahan of participating in a fraudulent flipping scheme,

including handling both sides of the contemporaneous transactions between Sunvest[3] and Cay

Clubs on one hand, and Cay Clubs and Plaintiffs, on the other hand, with knowledge that

fraudulent appraisals were utilized to complete Plaintiffs' real estate closings.

Additionally, Plaintiffs state that Callahan was involved in another fraudulent

scheme designed to induce Plaintiffs into purchasing the units.  According to Plaintiffs, they

were informed that they would receive a lump sum leaseback payment equal to 15% of the

purchase price after the closing, "as a major inducement to victimize purchasers."  (*Id*. ¶¶ 53-

55.)  Plaintiffs allege that "Callahan knew that it was the practice of Cay Clubs to enter into

oral leaseback agreements with prospective purchasers prior to the closings, with the routine

---

[3]Plaintiffs allege that Cay Clubs entered into a takedown agreement with an affiliate of
an entity known as "Sunvest" and controlled by Harvey Birdman. (Dkt. No. 1 ¶ 30.)

being that the actual leaseback agreements would be forwarded to the purchasers a few days after the closing." (*Id.* ¶ 78.) This was allegedly done to avoid a "paper trail" regarding the leaseback arrangements prior to the closings and circumvent applicable federal and state securities laws. (*Id.* ¶¶ 79-80.) In this manner, Plaintiffs allege that Callahan concealed the 15% lump sum leaseback from legitimate lenders and any purchasers of the loans, who, had they been aware, "either never would have made the loans at all or would not have made the loans on the terms they did." (*Id.* ¶¶ 81-82.)

Further, Plaintiffs assert that "Callahan and the firms failed to disclose to the purchasers material facts relating to the transactions. Callahan was an integral part of Cay Clubs . . . [and] had an ownership interest in DC703, LLC, the Cay Clubs' entity that acted as the seller at Clearwater Cay Club." (Dkt. No. 53 at 2-3.) Plaintiffs state that this ownership interest gave rise to a blatant conflict of interest that was never disclosed to the purchasers in Clearwater. (Dkt. No. 53 at 3.) This alleged material omission, in addition to the aforementioned alleged transgressions involving fraud or dishonesty, form the basis of Plaintiffs' contract claim for breach of the closing protection letters.

Defendants argue, *inter alia*, that "there is simply no way to try this case on the basis of class wide evidence." (Dkt. No. 74 at 6.) Although Defendants do not directly contest the commonality issue, in Defendants' Opposition to Class Certification (Dkt. No. 74), they provide ten arguments against class certification, many of which focus on Rule 23(b)(3) and assert that only individualized evidence could prove Plaintiffs' breach of contract claim.[4]

---

[4]At the hearing, Defendants asserted that predominance — not commonality — should be the focus of the Court's consideration for class certification purposes.

Here, the common question of law or fact is simply whether Callahan engaged in "fraud or dishonesty" in connection with the class members' closings. Given the common scheme of deceptive conduct alleged, as well as the relatively low standard of Rule 23(a), the Court finds that Plaintiffs have satisfied their burden as to commonality.

### iii) Typicality

The typicality requirement is met if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Like the commonality requirement, "the typicality requirement is permissive: representative claims are typical if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Bacon*, 275 F.R.D. at 692 (internal quotations omitted). Moreover, if "the same unlawful conduct was directed at or affected both the class representatives and the class itself, the typicality requirement is usually met irrespective of varying fact patterns which underlie the individual claims." *Id.* (*quoting Davis v. Southern Bell Telephone & Telegraph Co.*, No. 89-2839, 1993 WL 593999, at *4 (S.D. Fla. Dec. 23, 1993)).

Here, Plaintiffs' claims are typical of the claims of the class members as a whole. As Plaintiffs contend, the claims arise out of the same or similar practices of Callahan and the law firms and their involvement with the Cay Clubs' closings. (Dkt. No. 53 at 12.) Simply put, Plaintiffs allege that they have been harmed by the same deceptive conduct that affected all class members. As Plaintiffs have established the requisite "sufficient nexus" between the claims of the class and class representatives, the Court concludes that the typicality requirement of Rule 23(a)(3) has been met. *See Powers v. Government Employees Insurance Co.*, 192 F.R.D. 313, 317 (S.D. Fla. 1998) ("A sufficient nexus is established if the claims or

defenses of the class and the class representatives arise from the same event, pattern or practice and are based on the same legal theory.").

### iv) Adequacy of Representation

The final prerequisite to class certification, under Rule 23(a), is adequacy of representation. A class may be certified only if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy-of-representation requirement encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1323 (11th Cir. 2008) (citation and internal quotations omitted).

Plaintiffs assert that the named Plaintiffs have a fundamental understanding of the issues in the case, are committed to prosecuting this action, and have agreed to protect the interests of the class members. (Dkt. No. 53 at 13.) They further contend that they have the characteristics necessary to adequately represent the class and "they have no interests antagonistic to the class as a whole." (Dkt. No. 53 at 14.) Defendants argue, however, that Plaintiffs' proposed class "suffers from two important kinds of adversity that should prevent class certification." (Dkt. No. 72 at 21.) First, Defendants state that, unlike many later Cay Clubs buyers, the named Plaintiffs actually received their leaseback money. (Dkt. No. 74 at 22.) Second, they assert that some proposed class members "actually made money on some of their units by selling them for a profit." (*Id.*) Specifically, Defendants contend that "[a]t least 26 proposed class members in the Clearwater project appear to have sold their units for a

profit." (*Id.*; Dkt. No. 75, Ex. 34). Defendants argue that class members who sold their units are adverse to those who tried but could not. (Dkt. No. 74 at 22.)

A representative will be deemed inadequate "only if the conflict between the representative and the class is a fundamental one, going to the specific issues in controversy." *James D. Hinson Electrical Contracting Co., Inc. v. BellSouth Telecommunications, Inc.*, 275 F.R.D. 638, 643 (M.D. Fla. 2011). The Eleventh Circuit has held that a "fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class." *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003). "In such a situation, the named representatives cannot vigorously prosecute the interests of the class through qualified counsel because their interests are actually or potentially antagonistic to, or in conflict with, the interests and objectives of other class members." *Id.* (citations and internal quotations omitted). Further, the Eleventh Circuit has held that a class cannot be certified when its members have opposing interests or when it consists of members who benefit from the same acts alleged to be harmful to other members of the class. *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000). In the underlying case, some class members profited from their dealings with Callahan, while others suffered clear losses. Plaintiffs admit "[t]hat some fortunate buyers may have been able to sell their units at a profit prior to Cay Clubs' collapse" but argue that this issue is not relevant for purposes of class certification. (Dkt. No. 80 at 8.) However, at the hearing, Plaintiffs' counsel stated that those buyers who did not suffer out-of-pocket losses as a result of the underlying closings should be carved out of the class, as these individuals have no contract claim against Defendants and thus are not entitled to recovery. As such, with this

14

revision of the proposed class definition and the subsequent elimination of potential conflicts of interest, the Court is satisfied that the representative parties can fairly and adequately protect the interests of the class.[5]

Thus, the Court finds that Plaintiffs can meet the prerequisites pursuant to Rule 23(a). However, it is clear to the Court that the core issue to be resolved by Plaintiffs' request for class certification is whether the individualized issues predominate over common issues to the class, and, after careful consideration, it is apparent to the Court that the individualized issues in this case predominate over the common questions of fact and law.

### C. Rule 23(b)(3)

In addition to meeting the requirements under Rule 23(a), Plaintiffs must establish that one or more of the grounds for maintaining the suit as a class action are met under Rule 23(b). Plaintiffs seek certification under Rule 23(b)(3). Thereunder, a plaintiff bears the burden of demonstrating that two requirements are met: (1) predominance of the questions of law or fact common to the members of the class over any questions affecting only individual members; and (2) superiority of a class action for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3); *Bacon*, 275 F.R.D. at 694-95.

Here, Plaintiffs argue that common questions of law or fact "pervade the instant action." (Dkt. No. 53 at 16.) They contend that, inasmuch as the alleged fraudulent or dishonest acts primarily involve the failure to disclose, there are no individualized issues

---

[5]It should be noted that Defendants do not appear to challenge the qualifications and competence of Plaintiffs' counsel to vigorously prosecute the underlying action. However, if such a challenge was made, the Court is more than satisfied that Plaintiffs' counsel are qualified and experienced and could competently prosecute this case if the proposed class was certified.

regarding liability. Further, Plaintiffs argue that any individualized issues relating to damages are not an impediment to class certification. The Court agrees with this statement, as the damages calculation in this case is purely formulaic and may be easily computed for each class member. The Eleventh Circuit has held that "[p]articularly where damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification." *Klay v. Humana*, 382 F.3d 1241, 1259-60 (11th Cir. 2004). As stated previously, however, Defendants contend that the proposed class members' claims require individualized proof to establish the terms of their contracts, breach, and loss causation. Defendants further argue that their defenses likewise depend on individualized evidence.

In order to properly evaluate the validity of the parties arguments under Rule 23(b)(3), the Court must carefully examine the Plaintiffs' claim. Here, Plaintiffs assert a breach of contract claim and allege that Callahan committed fraud and/or dishonesty in handling documents, specifically the HUD-1, in connection with the closings by (1) failing to reflect the lump sum leaseback payment on the HUD-1 (Dkt. No. 1 ¶¶ 77-82); (2) purposely using "vague language" such as the "Birdman Release Price" on the HUD-1 to mislead victims (*id*. ¶¶ 84-85); and (3) failing to reflect on the HUD-1 that Cay Clubs did not own the units, such that "the purchaser victims were unaware that they were purchasing units which were being contemporaneously flipped to them at prices some two to four times what the Cay Clubs entities were paying for them" (*id*. ¶¶ 86-87). Additionally, Plaintiffs have alleged that Callahan engaged in fraud and/or dishonesty in handling Plaintiffs' funds by (1) diverting

Plaintiffs' funds to Cay Clubs "with full knowledge that Cay Clubs was engaged in a fraudulent flipping scheme" (*id*. ¶¶ 89-92) and (2) diverting Plaintiffs' funds to Cay Clubs and to the Birdman entities, knowing "that there were various bogus costs and charges . . . being passed on to purchasers," such as the allegedly fraudulent appraisal costs (*id*. ¶¶ 93-94). Plaintiffs assert that the Cay Clubs units were flipped "at artificially inflated, outrageous prices" based on "grossly fraudulent appraisals which would support the outrageous purchase prices." (*Id*. ¶¶ 64-65.) Significantly, Plaintiffs contend that the artificial prices were predicated upon seven alleged insider transactions. (*Id*. ¶¶ 44-49.)

As such, Plaintiffs repeatedly emphasize that this suit involves a contract claim, not a common law fraud, claim because the Complaint alleges under the above theories that Defendants breached their agreement to indemnify the Plaintiffs as required under the closing protection letters. (Dkt. No. 53 at 9.) Without question, the Court agrees that Plaintiffs' claim is for a breach of an indemnity contract. *See JP Morgan Chase Bank, N.A. v. First American Title Ins. Co.*, 795 F. Supp. 2d 624, 631 (E.D. Mich. 2011) (stating that a closing protection letter is an indemnity contract which must be enforced according to the plain and ordinary meaning of the words used in the instrument). In Florida, courts construe indemnity contracts according to ordinary rules of contract construction. *See Improved Benevolent & Protected Order of Elks of the World, Inc. v. Delano*, 308 So.2d 615, 617 (Fla. 3d DCA 1975). The intent of the parties and the scope of the indemnification provision are derived from the language of the contract and the circumstances in which it was made. *Id*.; *see also Gibbs v. Air Canada*, 810 F.2d 1529, 1533 (11th Cir. 1987). The terms of the indemnity contract determine whether the indemnitor is obligated to reimburse the indemnitee for a particular

claim. *See Camp, Dresser & McKee, Inc. v. Paul N. Howard Co.*, 853 So.2d 1072, 1077 (Fla. 5th DCA 2003) (citations omitted). In order to recover under an indemnity contract, the indemnitee has the burden of proving: (1) a breach of the indemnity contract; (2) the amount of the loss sustained; (3) the existence of the facts for which there was coverage; and (4) the reasonableness of the amount paid. *See Fidelity & Guar. Ins. Co. v. Ford Motor Co.*, 707 F. Supp. 2d 1300, 1313 (M.D. Fla. 2010) (citing *Port Everglades Auth. v. R.S.C. Indus., Inc.*, 351 So.2d 1148, 1150 (Fla. 4th DCA 1976)). Here, the Court finds that the controlling issue in dispute is whether individualized issues regarding the existence of facts for which coverage would be triggered under the closing protection letters predominates over common questions of fact or law.[6]

As stated previously, the closing protection letters provide, in relevant part, that Defendants agreed, *inter alia*, to:

> reimburse . . . [lenders and purchasers] . . . for actual losses incurred by . . . [them] . . . in connection with such closing when conducted by said Issuing Agent or Approved Attorney *when such loss arises out of:*
> . . .
>
> 2. *Fraud or dishonesty* of said Issuing Agent or Approved Attorney in handling your funds or documents in connection with such closings.

(Dkt. No. 1, Ex. D at 1) (emphasis added). Thus, although the Court agrees that this is a

---

[6] The Court recognizes that Defendants also assert that individualized issues must also be examined to determine the scope of the indemnity contracts at issue due to the assertion that the multiple lenders utilized in the transactions had varied closing instructions. However, the Court need not address this matter as it is satisfied that individualized issues relating to other matters predominate over any common issues of fact or law.

breach of contract case, under the plain language of the closing protection letter, Plaintiffs must establish that Callahan committed fraud or dishonesty in handling their funds or documents in connection with their closings and that their loss arose out of Callahan's fraud or dishonesty.

### i) Loss Causation

The phrase "*when such loss arises out of*," as used in the closing protection letter, places upon the Plaintiffs a burden to establish some causal connection between Callahan's alleged fraud or dishonesty and the Plaintiffs' alleged loss. Specifically, the Florida Supreme Court has examined the phrase "arising out of" in the context of an insurance contract and determined that "the term 'arising out of' is broader in meaning than the term 'caused by' and means 'originating from,' 'having its origin in,' 'growing out of,' 'flowing from,' 'incident to' or 'having a connection with.'" *Taurus Holdings, Inc. v. U.S. Fidelity and Guar. Co.*, 913 So.2d 528, 539-40 (Fla. 2005) (citations omitted). The phrase "*when such loss arises out of*" therefore "requires more than a mere coincidence between the conduct . . . and the injury. It requires 'some causal connection, or relationship.' But it does not require proximate cause." *Id.* (citations omitted); *see also Lawyers Title Ins. Corp. v. New Freedom Mortg. Corp.*, 645 S.E.2d 536, 543 (Ga. App. 2007) (examining a nearly identical closing protection letter and concluding that "[u]nder Georgia law, where a contract provides that a loss must 'arise out of' a specified act, it 'does not mean proximate cause in the strict legal sense' but instead encompasses 'almost any causal connection or relationship'"). Thus, the closing protection letter clearly provides that Callahan's alleged fraud or dishonesty must have had at least a minimal causal relationship to the Plaintiffs' loss in order for Plaintiffs to recover under the

indemnity contract.  In other words, if Plaintiffs' loss did not arise out of Callahan's alleged fraud or dishonesty, the Defendants' contractual duty to indemnify Plaintiffs for their loss would not be triggered.

The consideration of loss causation has a significant impact on the Court's Rule 23(b)(3) analysis.  Specifically, where Plaintiffs allege that they suffered losses because of Callahan's alleged fraudulent or dishonest misrepresentations and/or omissions, an individualized inquiry will likely have to be made to determine whether knowledge about Callahan's alleged fraud or dishonesty would have caused Plaintiffs or others to act differently (i.e. not execute the closing).  For example, Plaintiffs specifically allege that "[h]ad legitimate lenders known that the purchasers were going to be getting paid 15% lump sum leaseback payments after the closings, the lenders either never would have made the loans at all or would not have made the loans on the terms they did."  (Dkt. No. 1 ¶ 82.)  As alleged, this cause-in-fact assertion clearly implies that an individualized inquiry would be required to determine what any particular lender would have done in light of the Plaintiffs' allegations. *See State v. Hubbard*, 751 So.2d 552, 567 (Fla. 1999) (explaining cause-in-fact causation).

Plaintiffs allege a number of other omissions as tantamount to Callahan's fraud or dishonesty to include, among other things, (1) that Callahan failed to disclose his ownership interest in Cay Clubs (Dkt. No. 53 at 2-3); (2) that the Birdman Release Price was used to mislead buyers into thinking that a contemporaneous flip was not transpiring (Dkt. No. 1 ¶¶ 85-87); (3) that oral leaseback agreements were used to avoid a "paper trail" (*Id*. ¶¶ 79-80) and should have been reported on the HUD-1s; and (4) that Cay Clubs did not own the units it was attempting to sell (*Id*. ¶¶ 41-42).  Given the nature of these allegations, it is clear that

proof of loss will be primarily based upon a cause-in-fact analysis, which in essence will most likely require an individualized inquiry in order to establish that, but for Callahan's alleged dishonest act or omission, Plaintiffs would not have suffered a loss.

The Court is mindful that there certainly exists the possibility that based upon certain allegations the Plaintiffs could establish that they suffered a loss under the closing protection letter without such a "but-for" analysis. For instance, if Callahan assessed Plaintiffs bogus fees and charges in connection with their closings, as alleged, then regardless of any proof as to whether knowledge about the bogus charges and fees would have caused Plaintiffs to act differently, Plaintiffs could still establish that Callahan's conduct was the cause-in-fact for their losses associated with the bogus fees and charges.[7] However, Plaintiffs' Complaint alleges that "Plaintiffs and other class members suffered losses in various forms such as down payments (for those who made down payments), closings costs, 'developer's fees,' carrying costs on their units such as mortgage payments, taxes, insurance and condominium association fees, and other miscellaneous expenses associated with the acquisition and ownership of the units." (Dkt. No. 1 at 25, ¶ 168). Accordingly, to establish the losses as alleged, Plaintiffs' proof will likely be based primarily upon a cause-in-fact analysis focused on the premise that, but-for Callahan's alleged fraud or dishonesty, Plaintiffs and/or lenders

---

[7]Defendants argue that due to the terms of the closing protection letter Plaintiffs must establish that not only was Callahan fraudulent or dishonest, but that Plaintiffs also relied upon Callahan's fraud or dishonesty. (Dkt. No. 74 at 5) (*citing First American Title Ins. Co. v. Vision Mortgage Corp., Inc.,* 689 A.2d 154, 157 (N.J. Super. 1997)). The Court appreciates that "[i]n most cases, [a] plaintiff will not be able to establish . . . but-for causation if no one relied on the misrepresentation." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008). However, such is typically the case when proximate cause must be established. *Id.* Since, the closing protection letter does not require proximate cause, the Court then accepts the *possibility* of establishing loss under the closing protection letter without reliance.

would have proceeded differently in the respective closings. Significantly for the Court's consideration of class certification, such proof of loss inevitably will require an individualized inquiry of potentially each of the proposed class members and a number of lenders.

### ii) Fraud or Dishonesty

The Court must also consider the effect of the terms "fraud or dishonesty" as used in the closing protection letter. The closing protection letter does not define "fraud or dishonesty." In Florida, to show fraud through a misrepresentation, a party must establish the following: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *Johnson v. Davis*, 480 So.2d 625, 627 (Fla. 1985). As an initial matter, when confronted with the terms of "fraud or dishonesty," Plaintiffs argue that "[d]ishonest acts alone give rise to a contractual claim." (Dkt. No. 53 at 9.) Plaintiffs' argument suggests that although the term "fraud" could be construed under the common law definition, thereby requiring proof an intent to deceive and reliance, "dishonesty" on the other hand would not require proof of an intent to deceive or reliance. However, neither Plaintiff nor Defendant provide any authority as to whether proof of "dishonesty" by Callahan requires proof of either an intent to deceive or reliance.[8] Although this issue will most likely merit consideration for purposes of a

---

[8]It should be noted that Defendants rely on *Lawyers Title Ins. Corp.* to assert that the term dishonesty as used in the closing protection letter also requires proof of an intent to deceive and reliance. (Dkt. No. 74 at 4.) Although *Lawyers Title Ins. Corp.* does seem to infer that the Georgia appellate court concluded that the terms "fraud" and "dishonesty" were synonymous, and as such both terms required proof of intent to deceive and reliance, the issue is not entirely clear given that the Georgia appellate court never directly discussed the meaning of dishonesty as used in the closing protection letter. *Id.* at 540-43.

dispositive motion, it is unnecessary at this time to address what proof is necessitated by the term "dishonesty."

Rather, pertinent to the question of the appropriateness of class certification is the fact that even if Plaintiffs could establish Callahan acted dishonestly, Plaintiffs again would have to establish that their loss arose out of Callahan's dishonesty. In this regard, the Court finds that even if proof of "dishonesty" does not require proof of an intent to deceive, loss causation is still a necessary element for Plaintiffs to establish to trigger Defendants' liability under the closing protection letter. In other words, as explained previously, Plaintiffs must establish that Callahan's alleged dishonesty had at least a minimal causal relationship to the Plaintiffs' loss. A review of Plaintiffs' allegations suggest that if Callahan had told them or their lenders more, they would have refused to close or would have modified their closing. Another allegation highlighting this cause-in-fact assertion is Plaintiffs' allegation that Callahan acted dishonestly by failing to disclose his ownership interest in Cay Clubs. Certainly Callahan's ownership interest in Cay Clubs may have raised concerns among some prospective buyers. However, it would be inappropriate to presume that each buyer, even a reasonably prudent buyer, would not have proceeded with the transaction had Callahan's financial stake in Cay Clubs been disclosed. Although Plaintiffs' allegations could be the foundation for Plaintiffs' losses, they need not be. Simply stated, real estate purchasing decisions are intimate decisions, and as such, the proposed class members respective decisions to purchase a Cay Club unit could have varied on a number of factors, particularly in light of the real estate market during the alleged time period. *See e.g., Bacon*, 275 F.R.D. at 698-99 (noting that questions of reliance, investment strategy, and damages can necessitate individual

inquiry). Thus, regardless of whether "dishonesty" requires proof of an intent to deceive and reliance, the Court is satisfied that even if Plaintiffs can establish Callahan acted dishonestly, an individualized inquiry will still likely be necessary to properly assess loss causation, and such an inquiry is again indicative that the individualized issues for the alleged class would predominate over any common issues of fact and law.

Plaintiffs' arguments as to the closing protection letter's use of the term "fraud" are also unavailing. As noted previously, Plaintiffs repeatedly emphasize that this suit involves a contract claim, not a common law fraud claim. (Dkt. No. 53 at 9.) As such, Plaintiffs contend that they need not establish reliance, which is an element of a common law fraud claim. *Id.* The Court disagrees with this assertion. Rather, the Court is more persuaded by *Lawyers Title Ins.*, 645 S.E.2d at 540-43, in which a Georgia appellate court examined identical language in a closing protection letter and overturned the trial court's jury instruction, which included instructions as to constructive fraud. *Id.* Specifically, in *Lawyers Title Ins. Corp.*, the trial court instructed the jury as follows:

> I'm now going to charge you on misrepresentation and concealment.
>
> *Misrepresentation of a material fact, if acted on by the opposite party, constitutes legal fraud, whether misrepresentation was intentional or not.*
>
> If there is a willful misrepresentation of a material fact which was made to induce another to act and causes that person to act and the person is injured, then the person who was injured has the right of action. Mere concealment of a fact, unless it is done to deceive and mislead, will not support an action.
>
> In all cases of deceit, knowledge of the falsehood constitutes an essential element. However, fraudulent or reckless misrepresentation of facts as true which the party may not

> know to be false, if intended to deceive, is equivalent to
> knowledge of a falsehood.

*Id.* The Georgia appellate court concluded that the italicized portion of the jury instruction was in error, and stated that "[t]he CPL indemnified . . . against the issuing agent's '[f]raud or dishonesty,' and we read this language to require a showing of an intent to deceive." *Id.* As such, the Georgia appellate court clearly concluded that the closing protection letter required proof of actual fraud, and that proof of constructive fraud was insufficient given the plain reading of the language of the closing protection letter. And proof of actual fraud requires an intent to deceive and reliance. The Court agrees with the Georgia appellate court, and concludes that any proof of Callahan's alleged fraud under the closing protection letter would require both an intent to deceive and reliance. *See Johnson,* 480 So.2d at 627.

Notwithstanding, Plaintiffs assert that if their claims were founded in fraud, class certification would still be appropriate since the issue of individual reliance could be presumed. (Dkt. No. 53 at 10.) Notably, Plaintiffs state that "[f]raud claims in a class action that are based primarily on omissions, rather than affirmative misrepresentations, give rise to a presumption of reliance pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972)." (Dkt. No. 53 at 10.) In *Affiliated Ute*, the Supreme Court permitted a class-wide presumption of reliance and further held that such a presumption is appropriate in cases involving *primarily* omissions. 406 U.S. at 153-54 (emphasis added). However, the *Affiliated Ute* presumption has only been applied in the context of securities fraud cases. *Sikes v. Teleline, Inc.*, 281 F.3d 1350, 1364, *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) (discussing the *Affiliated Ute* and fraud-on-the-market presumptions of reliance and stating that "[t]he securities market presents a wholly

different context than a consumer fraud case, and neither this circuit nor the Supreme Court has extended a presumption of reliance outside the context of securities cases"). Given that Plaintiffs have presented no legal authority or other justifiable argument to extend the *Affiliated Ute* presumption of reliance outside the context of a securities litigation to the instant case, the Court finds that reliance cannot be presumed under *Affiliated Ute*. Without such a presumption, proof of individual reliance certainly suggests that the individualized issues will predominate over any common issues of fact or law.

### iii) Common Scheme

Alternatively, some courts have held that under the theory of a "common scheme," common issues of a fact and law can predominate any individualized issues of reliance or loss causation. *See Walco Investments, Inc.*, 168 F.R.D. at 333-34; *see also Bacon*, 275 F.R.D. at 696 (*citing Kirkpatrick v. J.C. Bradford*, 827 F.2d 718, 721-22 (11th Cir. 1987)). Here, as part of the alleged common scheme of deceptive conduct, Plaintiffs contend that Cay Clubs units were flipped "at artificially inflated, outrageous prices" based on "grossly fraudulent appraisals which would support the outrageous purchase prices." (Dkt. No. 1 ¶¶ 64-65.) Despite Defendants' contentions to the contrary, Plaintiffs argue that "the accuracy of individual appraisals received by putative class members is not the salient issue." (Dkt. No. 80 at 8.) Rather, they assert that the important fact is that these appraisals were all skewed by the same initial insider transactions. *Id.* As such, the Plaintiffs contend that the common issues of fact and law related to the alleged common scheme dwarf any consideration of individualized issues. Essentially, Plaintiffs seem to assert that since the alleged initial fraudulent insider transactions established an inflated market

for the Cay Clubs properties, any subsequent appraisal for a Cay Clubs unit was fraudulent since it was predicated upon the initial insider transactions.

The Court, however, is more persuaded by the Defendants' position on this matter. First, with the *Eisen* principle in mind, the Court makes no assessment as to whether Plaintiffs' proof can establish that the initial insider transactions were based upon fraudulent appraisals. *Eisen*, 417 U.S. at 175-76. However, the Court notes that Plaintiffs' expert indicated that in order to opine as to the veracity of any particular appraisal report, the appraisal report and other documents would have to be reviewed. See Dkt. No. 75, Ex. 3 at 54-55 (stating that "I am certainly not going to offer an opinion about . . . appraisal reports if I haven't seen them"). Thus, although mindful of Plaintiffs' alleged common scheme based upon the initial insider transactions, the Court is more persuaded that an individualized review of each appraisal would need to occur in order to establish that (1) each relevant appraisal was "grossly fraudulent" and (2) that Callahan had knowledge of the fraudulent nature of each appraisal, both of which would be required in order to bring the appraisals within the purview of the closing protection letter.

As Defendants contend, this could include a review of the appraisal work papers, the contracts, and testimony from the appraiser and lenders. Further, since Joseph Goenner[9] was not the only appraiser involved in these transactions, the same work would need to be replicated for each appraiser's work. The trial could potentially turn into a number of mini-trials to resolve the appraisal issue alone. Accordingly, while Plaintiffs have alleged a "common scheme," the Court is satisfied that the common issues of fact and law do not predominate. Given the individualized

---

[9]Plaintiffs appear to focus on the appraisals prepared by Joseph Goenner, though there were a number of appraisers involved in the Cay Clubs transactions.

inquiries necessary to establish the foundation of Plaintiffs' claim, the Court simply does not find that common issues of law or fact predominate over the individualized matters in this case.

### iv) Defendants' Affirmative Defense regarding notice requirement

Additionally, another factor demonstrating that individualized issues predominate over any common issues of fact or law relates to the Defendants' affirmative defense regarding the timeliness of the proposed class members' claims. Plaintiffs assert that consideration of Defendants' alleged affirmative defense is "'best raised' in [a] dispositive motion, not in class certification opposition." (Dkt. No. 108 at 2-3) (citations omitted). As noted by Plaintiffs, in *Smilow v. Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32, 39 (1st Cir. 2003), the court stated that "[c]ourts traditionally have been reluctant to deny class action under Rule 23(b)(3) simply because affirmative defenses may be available against individual members." However, the *Smilow* court also stated that "where common issues otherwise predominated, courts have usually certified Rule 23(b)(3) classes even though individual issues were present in one or more affirmative defenses." *Id.* Thus, Plaintiffs' assertion that the Court should not consider Defendants' alleged affirmative defense for class certification purposes is misguided. Rather, the inquiry remains the same; namely, do the individualized issues predominate over any common issues of fact or law? Further, and contrary to Plaintiffs' argument, some courts have found that individualized defenses themselves can predominate over common issues of law or fact to defeat class certification. *See e.g., White v. Deltona Corp.*, 66 F.R.D. 560, 564 (S.D. Fla. 1975) (denying class certification because each affirmative defense would have to be applied to each of the class members). Most significantly, the Eleventh Circuit has explicitly held that in determining whether class or individual issues predominate in a class action, the court must take

into account "the claims, *defenses*, relevant facts, and applicable substantive law." *Klay*, 382 F.3d at 1254 (emphasis added) (internal quotations and citations omitted). Therefore, under Rule 23(b)(3), it is appropriate for the Court to consider any individualized issues pertaining to the Defendants' alleged affirmative defense regarding the timeliness of the proposed class members' claims.

The Defendants' affirmative defense is based upon a notice provision in the closing protection letter. Specifically, the closing protection letter provides the following:

> Commonwealth Land Title Insurance Company shall not be liable hereunder unless notice of loss in writing is received by Commonwealth Land Title Insurance Company within ninety (90) days from the date of discovery of such loss.

(Dkt. No. 1, Ex. 6 at 3.)[10] Given that provision, Defendants argue that no class-wide proof could show when each buyer became aware of the alleged loss and/or whether each buyer ever made a claim, let alone a timely claim. The Court agrees with Defendants in that issues of personal knowledge are inherently individualized and therefore would require an individualized inquiry to determine when each proposed class member first became aware of their alleged loss.

Certainly, the individualized issues regarding Defendants' alleged affirmative defense alone may not preclude class certification. However, in light of the collective issues relating to loss causation, reliance and the Defendants' alleged affirmative defense, the Court is satisfied that

---

[10]As noted previously, the substantive language of the closing protection letters issued by each Defendant is identical. (Dkt. No. 1 ¶ 108.)

the individualized issues in this case predominate over the common issues of fact or law. As such, the undersigned recommends that the District Court find that Plaintiffs have failed to satisfy Rule 23(b)(3).[11]

**IV.  Conclusion**

For the foregoing reasons, it is hereby **RECOMMENDED** that Plaintiffs' Motion for Class Certification be **DENIED**.

**IT IS SO REPORTED** at Tampa, Florida on this 9th day of February, 2012.

_____
ANTHONY E. PORCELLI
United States Magistrate Judge

---

[11]The Court recognizes that there is also a superiority prong of Rule 23(b)(3), which focuses on "the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *Klay*, 382 F.3d at 1269 (citations omitted).  While Defendants argue that Plaintiffs' counsel's representations in a related case, *McGee et al v. Commonwealth Title, et al.*, No. 8:11-cv-1100, illustrate that there are too many individualized issues to certify a class action in this case, the Court does not find that these remarks have any bearing on this case at all.  Nonetheless, it is worth noting that at least roughly forty other individuals have initiated their own action against Defendant Commonwealth.  However, given the predominance of the individualized issues here, the Court need not determine whether a class action would be the superior method for "fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

**NOTICE TO PARTIES**

Failure to file and serve written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date it is served on the parties shall bar an aggrieved party from a *de novo* determination by the District Court of issues covered in the report, and shall bar the party from attacking on appeal factual findings in the report accepted or adopted on appeal by the District Court except upon grounds of plain error or manifest injustice. 28 U.S.C. § 636(b)(1)©; Local Rule 6.02; *Nettles v. Wainwright,* 677 F.2d 404 (5th Cir. 1982) (*en banc*).

Copies furnished to:

Hon. James D. Whittemore

Counsel of Record