UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CAROL BRINKER, et al.,

    Plaintiffs,

vs.                                                     Case No. 8:10-cv-1199-T-27AEP

CHICAGO TITLE INSURANCE COMPANY, et al.,

    Defendants.
_____/

## ORDER

**BEFORE THE COURT** is the Magistrate Judge's Report and Recommendation (R&R) (Dkt. 109), which recommends that Plaintiffs' motion for class certification (Dkt. 53) be denied. Upon consideration of the R&R, the parties' objections (Dkts. 111, 116), and their responses (Dkts. 118, 119), in conjunction with an independent review of the file, the R&R is adopted, approved, and confirmed, with one exception related to Defendants' pre-suit notice affirmative defense.[1]

### Discussion

The Magistrate found that the proposed class satisfies Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy. He recommended that class certification be denied, however, because Plaintiffs failed to show that common questions predominate, as required by Rule 23(b)(3). There are no objections regarding standing, numerosity, or the adequacy of counsel. Defendants object to the recommendations regarding commonality, typicality and the adequacy of the class representatives. Plaintiffs object to the recommendation that individual issues predominate. Both parties object that the Magistrate did not reach the question of superiority.

---

[1] Plaintiffs' request for oral argument is denied. The Magistrate considered lengthy oral argument before issuing the R&R. The parties have thoroughly briefed their objections, and oral argument would not materially assist the Court.

**Commonality**

Under Rule 23(a)(2), a class cannot be certified unless "there are questions of law or fact common to the class." Relying on *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), Defendants argue that Rule 23(a)(2) is not satisfied because the common question in this case, the existence of an alleged common fraudulent scheme, fails to resolve the issue of why each class member decided to close on his or her transaction. Commonality, however, does not require that the common questions resolve all issues in the case. "[E]ven a single common question will do." *Dukes*, 131 S. Ct. at 2556 (quotation and alterations omitted). The majority in *Dukes* "concluded that [plaintiffs] have not established the existence of any common question" because they failed to bridge the gap between the only common issue, whether Wal-Mart engages in a pattern or practice of discrimination, and the reason for each adverse employment action, which is the crux of a Title VII case. *Id.* at 2556-57 (emphasis added).

This action is quite the opposite. The proposed class members are parties to identical closing protection letters issued by Defendants. Plaintiffs allege that the same closing agent engaged in the same fraudulent or dishonest conduct at each closing, thereby triggering coverage under each closing protection letter. These common questions therefore directly relate to elements of Plaintiffs' breach of contract claims. And a classwide proceeding is capable of "generat[ing] common answers" to those questions which are "apt to drive the resolution of the litigation." *Dukes*, 131 S. Ct. at 2551 (quotation omitted). While some individualized issues will remain unresolved, Defendants' argument is better suited for Rule 23(b)(3)'s predominance inquiry rather than the "low hurdle of Rule 23(a)(2)." *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1356 (11th Cir. 2009).

**Typicality**

Under Rule 23(a)(3), Plaintiffs must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Defendants argue that typicality is lacking

because "there will be tremendous variation in what proposed class members were told and understood about these transactions." (Dkt. 111 at 4) (emphasis added). But Defendants have not pointed to any record evidence supporting this assertion.

Plaintiffs' claim is that the closing agent omitted certain items from their HUD-1 closing statements, used vague or misleading language on the closing statements, imposed bogus charges, paid funds to the seller with knowledge of the seller's alleged fraudulent scheme, and used fraudulent appraisals. Plaintiffs further allege that this identical scenario was repeated at the closing of each class member. Plaintiffs' claims "arise from the same . . . pattern or practice and are based on the same legal theory" as the rest of the class. *Williams*, 568 F.3d at 1357 (quotation omitted). Plaintiffs "possess the same interest and suffer[ed] the same injury as the class members," and therefore, have brought claims that are typical of the proposed class. *Id.* (quotation omitted).[2]

**Adequacy**

Rule 23(a)(4) requires a determination that "the representative parties will fairly and adequately protect the interests of the class." Defendants argue that Plaintiffs are inadequate representatives because they have a conflict of interest with any class members who did not receive a leaseback payment. It is entirely unclear, however, whether any such class members exist. As Plaintiffs observe, Defendants have not pointed to record evidence showing that any class members did not in fact receive a leaseback payment. While Plaintiffs have the burden of demonstrating the absence of a conflict, Defendants must submit at least some evidence to support the factual underpinnings of the alleged conflict. *Cf. Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1191-94 (11th Cir. 2003) (discussing evidence supporting a potential conflict among class members).

---

[2] The cases Defendants rely on do not compel a different result. *Vega v. T-Mobile USA, Inc.* is unpersuasive because, in this action, all class members are parties to the same contract and, further, Defendants have not identified any record evidence showing that there was a variation in what the class members were told and understood. 564 F.3d 1256, 1276-77 (11th Cir. 2009). *Pop's Pancakes, Inc. v. NuCO2, Inc.* is distinguishable for the same reasons. 251 F.R.D. 677, 682-83 (S.D. Fla. 2008).

Defendants' unsupported assertion that some class members may not have received a leaseback payment fails to overcome Plaintiffs' showing that they are adequate representatives of the class.

Further, there is no conflict with any purchasers who were able to sell their units for a higher price than the class representatives. Plaintiffs agreed to exclude from the class any purchasers who sold their units for a profit. As for the others, a conflict does not arise simply because Plaintiffs may have sustained a greater loss. The pertinent question is whether the class representatives "claim to have been harmed by the same conduct that benefitted other members of the class." *Valley Drug Co.*, 350 F.3d at 1189. On this record, the class members were harmed in the same manner as Plaintiffs. Plaintiffs are therefore adequate class representatives.

**Predominance**

A class cannot be certified under Rule 23(b)(3) unless "the questions of law or fact common to class members predominate over any questions affecting only individual members." "Even if Rule 23(a)'s commonality requirement may be satisfied . . . , the predominance criterion is far more demanding." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997). "Where, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3)." *Williams*, 568 F.3d at 1357 (quotation omitted). Indeed, "serious drawbacks to the maintenance of a class action are presented where initial determinations, such as the issue of liability *vel non*, turn upon highly individualized facts." *Id.* (quotation omitted).

The Magistrate found that the existence of facts triggering coverage under the closing protection letters is a highly individualized inquiry which predominates over any common questions. The closing protection letters provide:

> [Defendants] hereby agree[] to reimburse you for actual loss incurred
> by you in connection with such closing when conducted by said

4

>Issuing Agent or Approved Attorney <u>when such loss arises out of</u>:
>
>. . .
>
>2. Fraud or dishonesty of said Issuing Agent or Approved Attorney in handling your funds or documents in connection with such closing.

(Dkt. 1-5 at 2) (emphasis added).

The critical issue is whether each proposed class member's loss 'arose out of' the alleged fraud or dishonesty of the closing agent. Adopting Defendants' parlance, the Magistrate referred to this contractual requirement as "loss causation." Seizing on this language, Plaintiffs argue that unresolved issues of 'loss causation' are no impediment to class certification. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2186 (2011).

In *Erica P. John Fund* and other securities fraud cases, 'loss causation' is an essential element which requires proof "that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss." *Id.* Stated differently, a securities fraud plaintiff must show not only that the misrepresentation inflated the price of a stock, but also that the revelation of the truth was the reason for a later decline in the stock's value. *See id.* This, clearly, is a matter which can be addressed by classwide proof. In contrast to securities fraud cases, the R&R simply uses the term 'loss causation' to refer to the contractual requirement that the loss sustained by each Plaintiff must "arise[] out of" the fraud or dishonesty of the closing agent. As will become apparent, this is a matter which can only be established through individualized proof.

Under Florida law, "the term 'arising out of' is broader in meaning than the term 'caused by' and means 'originating from,' 'having its origin in,' 'growing out of,' 'flowing from,' 'incident to' or 'having a connection with.'" *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 539 (Fla. 2005) (quotation omitted). The Magistrate acknowledged this definition but found that Plaintiffs' claims, by their very nature, can only be established with proof that their losses were proximately caused by the closing agent. A closer examination of Plaintiffs' claims shows that this

5

assessment is correct.

Plaintiffs allege that they "and other class members suffered losses in various forms such as down payments (for those who made down payments), closings costs, 'developer's fees,' carrying costs on their units such as mortgage payments, taxes, insurance and condominium association fees, and other miscellaneous expenses associated with the acquisition and ownership of the units." (Compl. ¶ 168). These types of losses, which consist of Plaintiffs' payments and carrying costs for the units, can only be said to 'arise out of' the alleged fraud or dishonesty of the closing agent if Plaintiffs can show that they would not have closed had the closing agent provided them with accurate information. Florida law is clear that there must be at least "some causal connection, or relationship" between the fraud and Plaintiffs' losses. *Taurus Holdings*, 913 So. 2d at 539. As Defendants aptly observe, Plaintiffs' "[o]bjection is not once able to articulate *what* that 'minimal causal relationship' could possibly be *other* than that Plaintiffs would not have closed if they had been told more." (Dkt. 119 at 3). In short, unless Plaintiffs' decisions to close on their respective transactions were based on the closing agent's representations or omissions, the existence of any fraud or dishonesty on his part was "a mere coincidence" which bore no causal connection with their payments and carrying costs. *Taurus Holdings*, 913 So. 2d at 539.

That Plaintiffs' claims depend on such a causal relationship is further supported by the affidavits they submitted in support of class certification. Each Plaintiff averred, "[h]ad I known that such an absurd profit was being made by Cay Clubs on our unit . . . [or] that units were being flipped to insiders . . . at the prices they were, I never would have purchased the unit." (Dkt. 51-44, C. Brinker Decl. ¶¶ 10-11; Dkt. 51-45, J. Brinker Decl. ¶¶ 10-11; Dkt. 51-46, Pugmire Decl. ¶¶ 11-12; Dkt. 51-47, McNulty Decl. ¶¶ 10-11; Dkt. 51-48, Shore Decl. ¶¶ 11-12; Dkt. 51-49, C. Warner Decl.

¶ 9; Dkt. 51-50, K. Warner Decl. ¶ 9).[3]

Whether each respective Cay Clubs purchaser would have closed on his or her transaction, notwithstanding the alleged misrepresentations and omissions, is something which cannot be established by classwide proof. As the Magistrate aptly recognized, "real estate purchasing decisions are intimate decisions, and as such, the proposed class members' respective decisions to purchase a Cay Club unit could have varied on a number of factors, particularly in light of the real estate market during the alleged time period." (Dkt. 109 at 23). Indeed, as one Plaintiff testified:

> Q. Is it fair to say that looking at all the documents that you signed in connection with this transaction, if you had read some of them a little bit more carefully, you might have gone to see a lawyer or somebody else to get some advice from them, just to you, somebody who wasn't connected with Cay Clubs, to give you some advice about whether or not you should buy unit 339?
>
> [Objection omitted]
>
> A. Back then, reading everything, it certainly all look[ed] very official, coming from real estate professionals. I probably still would have certainly signed everything. You know, hindsight's 20/20. Now that I've been through this, I probably wouldn't. But back then, everything certainly seem[ed] very official.

(Dkt. 75-4, McNulty Dep. p. 192-93). Considering the facts and circumstances of this case, an individualized inquiry will have to be made to determine the reasons why each purchaser decided to close and whether he or she would have closed if the closing agent had accurately disclosed all information. This simply cannot be done on a classwide basis.

To be sure, Plaintiffs are seeking to recover losses other than their payments and carrying costs. Specifically, Plaintiffs allege that they paid "bogus costs" for "fraudulent appraisals at grossly

---

[3] Plaintiffs' claims related to decisions by lenders involve a similar causal relationship. The complaint alleges, "[h]ad legitimate lenders known that the purchasers were going to be getting paid 15% lump sum leaseback payments after the closings, the lenders either never would have made the loans at all or would not have made the loans on the terms they did." (Compl. ¶ 82). While Plaintiffs have since taken the position that they "need not prove that allegation to prevail at trial," to the extent they continue to rely on the lenders' decisions as a basis for their claims, proof of proximate cause will be necessary. (Dkt. 116 at 9).

inflated valuations." (Compl. ¶¶ 93, 94). Plaintiffs further allege that they paid inflated prices which were "support[ed]" by these "grossly fraudulent appraisals" of their units. (*Id.* ¶ 65). Such losses could be said to 'arise out of' the alleged fraud or dishonesty of the closing agent, regardless of whether Plaintiffs decided to close based on his representations or omissions.

Establishing these losses will require an individualized inquiry. Plaintiffs contend that the appraisals were fraudulent because they relied on "[b]ogus insider transactions" as comparable sales. (Dkt. 116 at 20). Yet, Plaintiffs do not argue that each appraisal was identical or that each appraisal relied exclusively on insider transactions.[4] And Plaintiffs' expert testified that he could not opine on the veracity of any particular appraisal report without reviewing it. (Dkt. 75-3, Gregoire Dep. p. 54-55). Therefore, as the Magistrate found, "an individualized review of each appraisal would need to occur in order to establish that (1) each relevant appraisal was 'grossly fraudulent' and (2) that [the closing agent] had knowledge of the fraudulent nature of each appraisal, both of which would be required in order to bring the appraisals within the purview of the closing protection letter." (Dkt. 109 at 27). Accordingly, losses associated with "bogus fees" for fraudulent appraisals and with the use of fraudulent appraisals to support excessive prices can only be established by individualized proof.

In addition to the 'arising out of' requirement, the Magistrate found that Plaintiffs' claims will also require proof of reliance, to the extent they are based on the fraud of the closing agent.[5] Notwithstanding Plaintiffs' arguments to the contrary, the Court agrees that reliance must be shown to establish a claim under the closing protection letters based on the closing agent's fraud. (*See* Dkt. 109, R&R at 24-25). And in this case, proof of reliance will require an individualized inquiry.

---

[4] In fact, the appraisals attached to the complaint appear to show the use of one or more comparable sales based on condominium units outside the Cay Clubs project.

[5] The Magistrate noted that a claim based on the dishonesty of the closing agent may or may not require proof of Plaintiffs' reliance. However, such a claim would require individualized proof that Plaintiffs' losses 'arose out of' the closing agent's dishonesty, as discussed.

8

As a preliminary matter, reliance is not appropriately presumed in this action. While a presumption of reliance may arise in cases involving primarily omissions, such a presumption is best suited for securities fraud cases. *See Sikes v. Teleline, Inc.*, 281 F.3d 1350, 1363 (11th Cir. 2002) ("The securities market presents a wholly different context than a consumer fraud case, and neither this circuit nor the Supreme Court has extended a presumption of reliance outside the context of securities cases."), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).[6] Although Plaintiffs suggest otherwise, the fraud-on-the-market presumption simply has no place in this action.[7] Based on the present record, Cay Clubs units are not comparable to securities traded on a "well-developed" "efficient market." *Erica P. John Fund*, 131 S. Ct. at 2185.

Plaintiffs also cannot use common evidence to establish reliance in this action. As Plaintiffs note, the Eleventh Circuit has held that, in appropriate circumstances, reliance can be established by circumstantial evidence common to the entire class. *See Klay v. Humana, Inc.*, 382 F.3d 1241, 1258-59 (11th Cir. 2004). But the necessary factors are not present in this action.

First, the common issues of fact are not substantial and do not predominate over individual issues. *See Klay*, 382 F.3d at 1258-59. Unlike *Klay*, which involved a RICO claim, the existence of a common pattern of fraudulent activity is not an element of Plaintiffs' claims. An individual plaintiff could prove a breach of his or her closing protection letter regardless of whether any scheme or pattern existed. And as discussed, the question of whether each class member's loss 'arose out of'

---

[6] Although Plaintiffs dispute this proposition, the only cases they rely on are two district court cases, neither of which is persuasive. *Taplett v. TRG Oasis (Tower Two), Ltd., L.P.* involved a claim under the Interstate Land Sales Full Disclosure Act (ILSFDA), and the court expressly acknowledged that "in interpreting [ILSFDA], courts have applied the more comprehensively developed jurisprudence of securities cases." 755 F. Supp. 2d 1197, 1201 (M.D. Fla. 2009). *Lymburner v. U.S. Financial Funds, Inc.*, involved a claim that certain material information "was omitted from [plaintiff's] loan documents." 263 F.R.D. 534, 542 (N.D. Cal. 2010). While Plaintiffs' claims are based in part on certain omissions, their claims do not consist of "primarily a failure to disclose." *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972). Specifically, Plaintiffs allege that fraudulent appraisals were used to support the inflated prices of their units and that the closing agent misrepresented the nature of the transactions by using vague language on their closing statements.

[7] To the extent Plaintiffs rely on *Slayter v. DC 701, LLC*, No. 8:07-cv-1903-T-24EAJ, 2008 WL 2695645(M.D. Fla. July 3, 2008), their argument is not persuasive, as they have not filed a securities fraud claim.

the alleged fraud or deceit of the closing agent is a distinctly individualized issue.

Second, "the nature of the misrepresentations" in this action do not lend themselves to proof by "circumstantial evidence that . . . is common to the whole class." *Klay*, 382 F.3d at 1259. The misrepresentations in *Klay* were "simply that the defendants repeatedly claimed they would reimburse the plaintiffs for medically necessary services . . . and sent the plaintiffs various EOB forms claiming that they had actually paid the plaintiffs the proper amounts." *Id.* The Eleventh Circuit noted, "[i]t does not strain credulity to conclude that each plaintiff, in entering into contracts with the defendants, relied upon the defendants' representations and assumed they would be paid the amounts they were due." *Id.* Because a jury could reasonably draw such an inference from "the nature of the alleged misrepresentations," reliance could be shown through circumstantial evidence common to the entire class. *Id.*; *see also James D. Hinson Elec. Contracting Co. v. BellSouth Telecomms., Inc.*, 275 F.R.D. 638, 646 (M.D. Fla. 2011) (allowing common proof of reliance through circumstantial evidence where the nature of the alleged misrepresentation was defendant's inclusion of amounts on bills which it could not legally recover).

In this action, by contrast, it cannot be concluded from each class member's decision to close that he or she relied on any omissions or misrepresentations of the closing agent. As discussed, the decision to purchase real estate is a personal matter that may be based on a variety of factors. And as noted, at least one Plaintiff suggested that she still would have signed everything. Given the facts and circumstances of this case, it cannot be assumed that each class member relied on any alleged misrepresentations and omissions simply because he or she decided to close.[8]

While the 'arising out of' and reliance requirements can only be established by individualized proof, the affirmative defense that some class members failed to comply with a pre-suit notice

---

[8] Plaintiffs further argue that a class should be certified simply because they have alleged a common scheme. This contention is unpersuasive for the reasons discussed above and stated by the Magistrate.

provision does not present individualized issues. Under Florida law, which governs the closing protection letters, "it is sufficient if the contract [notice] provision is satisfied, or compliance is excused, as to the class plaintiffs." *Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699, 704 (Fla. 3d DCA 2000) (reversing denial of class certification). An individual inquiry of each class member is therefore unnecessary.

**Superiority**

In addition to predominance, Rule 23(b)(3) requires an assessment of whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Relevant considerations include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

With respect to the first factor, Plaintiffs seek losses of approximately $75,000 per condominium unit, with many class members purchasing multiple units. Further, as Defendants correctly observe, numerous individual members of the proposed class have already filed actions related to their Cay Clubs purchases.[9] Regardless of their disposition, these actions, along with the considerable amount in controversy, demonstrate a willingness on the part of the proposed class members to control the prosecution of separate actions for damages sustained in the purchase of their

---

[9] A non-exclusive list of actions that are or were pending in federal court includes: *McGee v. Cook*, No. 8:09-cv-2543-JDW-TGW (M.D. Fla.), *Clark v. Fifth Third Bank*, No. 8:09-cv-00448-EAK-TGW (M.D. Fla.), *Slayter v. DC 701, LLC*, No. 8:07-cv-1903-T-24-EAJ (M.D. Fla.), *Gastaldi v. Sunvest Resort Communities, LC*, No. 08-62076-CIV (S.D. Fla.).

condominium units. Plaintiffs' concerns with attorney's fees appear to have been no impediment to pursuing claims in the prior cases, many of which were filed by groups of Cay Clubs purchasers. This factor strongly militates against certification.

As for the second factor, at least one of the federal actions included claims against some of the same Defendants as this action. *See McGee v. Commonwealth Land Title Insurance Company*, 8:11-cv-1100-JDW-TGW. However, as Plaintiffs point out, that action was dismissed with prejudice. And it did not involve a claim under the closing protection letters. This factor favors Plaintiffs, albeit minimally, considering the multiplicity of actions already filed by Cay Clubs purchasers alleging fraud in the sale of their condominium units.

The third factor considers the relative efficiency a class action would afford, whether the case involves an aggregation of small claims, and whether the court has already handled several preliminary matters. *Klay*, 382 F.3d at 1270-71. Given that individualized issues predominate this action, any trial would necessarily require the presentation of a substantial amount of evidence specific to each class member. Further, the total amount of each claim is sufficiently large to warrant pursuit on an individual basis. And while a motion to dismiss and several minor discovery disputes have been resolved, no dispositive motions have been filed or taken under consideration. The third factor weighs against certification.

The fourth factor addresses the likely difficulties in managing a class action. This assessment considers whether a class action "will create relatively more management problems than any of the alternatives," including some 300 separate actions. *Klay*, 382 F.3d at 1273. In this action, the quantum of individualized proof that must be made "poses serious challenges to the efficiency and manageability of a class action proceeding." *Vega*, 564 F.3d at 1278. For their part, Plaintiffs have not shown how these challenges could be overcome in a single proceeding. While there are indeed some common matters, the predominance of individualized issues poses substantial concerns in

managing this proceeding as a class action. This factor tips, however, slightly, against certification.

Considering the relevant factors, a class action is not superior to the other available methods of fairly and efficiently adjudicating this controversy, including individual or group actions. Because Plaintiffs failed to establish the predominance and superiority requirements of Rule 23(b)(3), this cause is not appropriately certified as a class action.

## Conclusion

Accordingly, with the exception of the recommendation that the notice defense requires individualized inquiries, the Report and Recommendation (Dkt. 109) is adopted, approved, and confirmed and is made part of this order for all purposes, including appellate review. Plaintiffs' motion for class certification (Dkt. 53) is DENIED.

**DONE AND ORDERED** this 29th day of March, 2012.

JAMES D. WHITTEMORE
United States District Judge

Copes to: Counsel of record